

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CLAYTON LEE WAAGNER,
　　　Petitioner/Defendant

Case No. 2:02-cr-00582-AB-1

Civil No. **14    0550**

v.

Hon. Anita B. Brody

UNITED STATES OF AMERICA,
　　　Respondent
_____/

JAN 2 1 2014

RECEIVED

FIRST MOTION UNDER U.S.C. §2255 TO VACATE AND CORRECT SENTENCE

## I. INTRODUCTION

Now comes Petitioner/Defendant Clayton Waagner, pro se, hereafter "Petitioner", bring this instant motion pursuant to the provisions of 28 U.S.C. §2255 claiming numerous violations of due process.

## II. PROCEDURAL BACKGROUND

Petitioner was indicted 09/19/2002 for 79 counts on charges related to two separate sets of 2001 hoax anthrax threat letters sent to various reproductive health providers across most of the eastern United States. Arraignment was held 10/17/2002 on the 79 counts, Petitioner enter a not guilty plea. Case was declared "Complex" 10/22/2002. Docket number "8", entered on 10/24/2002 is the first of twenty-nine docket entries to define Petitioner as "pro se", which is significant as Petitioner acted as his own counsel throughout the entire trial process. On 12/15/2003

Petitioner was found guilty on all but two counts after a ten day
jury trial.  On 7/7/2005 Petitioner was sentenced to 228 months on
each of the fifty-one (51) counts he was convicted of, along with
three (3) years supervised release on each of the fifty-one (51)
counts also to run concurrently with each other.  Plus a total of
$2,725.00 in assessment fees, without any form of break down by charge.

Petitioner did not enter a direct appeal and this action represents
his first post-conviction relief motion in this matter.  It is Petitioner's
first filing under 28 U.S.C. §2255.


**GROUNDS FOR RELIEF**

**GROUND #1**  VIOLATION OF SIXTH AMENDMENT RIGHT TO COUNSEL
              (Feretta/Gidedon violation)


     The District Court violated Petitioner's Sixth Amendment Right
to Counsel in two fundamentally guaranteed due process rights.  First,
the District Court failed to provide Petitioner with counsel in a
felony criminal matter and second, the District Court allowed Petitioner
to proceed through an entire trial process without ensuring Petitioner
intended to waive his right to counsel in a knowing and intelligent
manner by giving a Faretta colloquy.

FACTUAL ASSERTION:
     Petitioner operated pro se throughout the entire criminal proceeding,
in a case declared "complex" by the court, where Petitioner was ultimately

- 2 -

convicted under federal "Terrorism" statutes.  The official docket
sheet in this matter, "CRIMINAL DOCKET SHEET FOR CASE #:2:02-cr-
00582-AB-1" list the Petitioner in the first position under "represented
by", and list Petitioner as "PRO SE".  Of the 146 docket entries
in this case, twenty-nine separate docket entries site Petitioner
as being "pro se".  Petitioner acted as his own counsel in this case,
performed every duty counsel would perform through fifteen months
of pretrial proceedings, through the two day jury selection, through
the ten day trial, and through nineteen months of post-trial, pre-
sentencing procedures.  Petitioner defended himself through this
entire trail process with Federal Public Defender Luis A. Ortiz functioning
as "Stand-By Counsel".


BACKGROUND:

    Already serving time at the United States Penitentiary in Lewisburg,
Pennsylvania, Petitioner was indicted 09/19/2002 in the Eastern District
of Pennsylvania on a 79 count indictment.  Petitioner had never actually
been arrested in the Eastern District of Pennsylvania, so his first
contact with the court system there was on 10/17/2002 at his Arraignment.
The Arraignment was held in Court Room 5-A before Federal Magistrate
Judge Welsh.  Petitioner appeared without having spoken to or having
been offered legal counsel.  During the Arraignment a man later identified
as Luis A. Ortiz of the Federal Public Defender's Office sat at the
table beside Petitioner.  Throughout the Arraignment Petitioner addressed
the Magistrate himself and entered a plea of not guilty to all charges.
At some point in the proceedings the AUSA asked Magistrate Judge
Welsh something to the effect of, "Shouldn't you appoint a lawyer

for him?" while pointing at Petitioner.  To which Magistrate Judge
Welsh said something to the effect of, "It was my understanding that
he was going to represent himself."  She then turned to Petitioner
and asked, "Are you going to represent yourself?"  To which Petitioner
responded, "Yeap", or some other single word affirmative.  At that
point, Luis Ortiz was introduced as Stand-by Counsel.

This exchange represented the first and only time the issue
of counsel for the defendant or self-representation was mentioned
in the course of the criminal proceedings that began with an Arraignment
October 17, 2002, through a 10 day jury trial ending with a guilty
verdict on 51 counts December 15, 2003, and ended in a sentence of
228 months in prison on July 7, 2005.  Petitioner did not appeal
the conviction.  Through a trial and sentencing period that lasted
thirty-four months, Petitioner was never offered counsel, nor offered
the opportunity to make an intelligent and knowing waiver of counsel
through a Faretta hearing.

This is further mitigated in that Petitioner's mental competency
was an issue.  Before the instant case, Petitioner had been through
two other federal trials in what was a string of cases against him,
for events that began in 1999 and ended in 2001.  The first trial
was in the Seventh Circuit, the next in the Sixth Circuit.  The first
of these trials was in the Central District of Illinois where Petitioner
was charged with possession of a stolen motor vehicle and felon in
possession of a firearm.  At the trial in Illinois Petitioner had
representation and plead not guilt by reason of insanity.  The defense

- 4 -

was based on Petitioner's belief that, immediately following the
death of his unborn granddaughter, God instructed him to kill abortion
doctors.  The jury rejected Petitioner's insanity defense and issued
a guilty verdict.  Petitioner escaped prior to sentencing and went
on a well documented continuation of his efforts to combat legal
abortion.  The charges in the instant case occurred during this time
on escape.

Petitioner contends that through all of this he was demonstrably
delusional, which had been diagnosed and documented by a Federal
Bureau of Prisons forensic psychologist under order of the trial
court in the Central District of Illinois.  This same delusional
state was obvious through Petitioner's words and acts throughout
the trial proceedings in Urbana, Illinois, through his ten months
as an escaped fugitive, during his trial in the Southern District
of Ohio, and in the case at bar in the Eastern District of Pennsylvania.
These same delusional attributes are evident in the book Petitioner
wrote and published on the subject of his crimes, including the charged
crimes in the case at bar ("Fighting the Great American Holocaust"),
which was admitted into evidence at trial in the case at bar).  Petitioner's
delusional view that he was on a mission from God were also apparent
in the interviews he had given to the press, and the numerous articles
he had written for extreemist anti-abortion publications and web
sites.  In this same vain, Petitioner used the pre-trial proceedings
of this case to attempt to further his anti-abortion views by attempting
to utilize the "Defense of Necessity" to show that his own actions
were justified, that abortion was immoral and illegal.  Also during

pre-trial proceeding Petitioner filed a frivolous Rule 60 motion challenging Roe v. Wade on Constitutional grounds.


All serve to demonstrate Petitioner suffered from a delusional disorder and that the District Court in the case at bar had to at least suspect some form of diminished capacity from the Defendant acting as his own counsel before the Court. And while the District Judge cannot be expected to make psychiatric evaluations, such had already been made at the first case in this string. The below is from Petitioner's January 16, 2002 PSI--written eight months prior to the Arraignment on the case at bar--line #87 from the Central District of Illinois. The excerpt is from a Court ordered forensic report of the Petitioner, by Dr. Daniel Greenstein, who has a doctoral degree in clinical psychology and was at the time employed by the Federal Bureau of Prisons as a forensic psychologist. Dr. Greenstein conducted extensive interviews with Petitioner, produced a psychological forensic report for the Court, and testified as an expert witness at Petitioner's trial.


"Dr. Greenstein concluded that defendant Waagner suffers from Adjustment Disorder with Disturbance of Emotions and Conduct (Chronic), Delusional Disorder, (Grandiose Type), Adult Antisocial Behavior (Axis I), and Antisocial Personality Disorder (Axis II). The diagnosis of Adjustment Disorder with Disturbance of Emotions and Conduct (Chronic) is indicated by the defendant's obsession with anti-abortion issues due to a life stressor (daughter's miscarriage), which caused his work and family relations to suffer. The diagnosis of Delusional Disorder (Grandiose Type) is indicated by the pressure of one or more nonbizarre delusions or extremely irrational beliefs that persist for at least one month (defendant's belief that God wanted him to kill abortion doctors, his series of communications with God, and his willingness to sacrifice his life in pursuit of said killings)."

- 6 -

After Dr. Greenstien's diagnosis and prior to the crimes that resulted in the multi-jurisdictional charges involved in the case at bar, Petitioner escaped and and spent ten months actively terrorizing the abortion industry as part of his unrational and delusional belief that God had told him to kill abortion doctors.

Throughout all of these processes Petitioner attempted to use the legal process as a continuation of his "God given campaign". The Court in the case at bar was well aware of this as it had ruled against allowing Petitioner to present the Defense of Necessity and even issued an order to prevent Petitioner from using the term "abortion" or "abortion clinic" at trial involving the illegal and purposeful closure of reproductive health care facilities.

Even though the case at bar went through a lengthy trial process, Petitioner's guilt was never in doubt.  While still on the run Petitioner admitted his guilt in a taped interview to a known pro-life reporter, even provided hard evidence of his guilt in the form of copies of the threat letters and Federal Express air bills used in the crime. After his arrest Petitioner admitted his guilt to the FBI, even explained how he committed the crime in detail.  Petitioner went on to give numerous media interviews in which he admitted guilt to the crime and even wrote a book on the subject ("Fighting the Great American Holocaust") which was published before the trial began, which the government used as evidence at trial.

CONCLUSION:

After repeatedly admitting guilt in the crime, and after providing evidence connecting himself to the crime, and giving the FBI details of the crime, Petitioner had no zero possibility of a not guilty verdict at trial. Petitioner's only reason for going to trial was to promote his delusional belief that God had called him to stop legal abortion.

Any competent defense lawyer would have advised Petitioner to plea guilty to a case that could not possibly be won at trial, and would have focused defense efforts towards gaining a reduced sentence based on Petitioner's documented state of diminished capacity as a result of the "life stressor" he had experienced when holding his stillborn granddaughter as a mitigating factor in the crimes.

Petitioner would have benefited greatly from competent legal counsel. Without legal counsel Petitioner followed his delusion that he was "God's Warrior". This clinically diagnosed "Axis I Delusional Disorder (Grandiose Type)" (as diagnosed by Dr. Greenstein) is evident in all of Petitioner's actions before and during the trial process. In this state, Petitioner was unable to consider the reality of the charges against him, nor the legal advantages available through a guilty plea that focused on a downward departure based on a medical diagnosis that specifically credited his Axis I psychological disorder as the reason for his actions. A competent lawyer would have also explored other legal challenges available at sentencing, none of which was availed to Petitioner through lack of representation.

Had Petitioner not been acting in a diminished mental state as a result of his previously diagnosed Axis I psychological disorder, he would have not have attempted to defend himself, nor would he have went to trial.  Petitioner would have allowed counsel to enter a plea of guilty and argued for a downward departure based on Dr. Greenstein's diagnoses as having an Axis I Delusional Disorder.  Even called Dr. Greenstein as an expert witness at sentencing.  As it were, acting as his own counsel, Petitioner choose not to site his diagnosed Axis I disorder, a diagnosis that would have given the District Court a valid reason to sentence him below the guidelines.

For the reasons stated above, the District Court deprived Petitioner of his Sixth Amendment Right to Counsel by not offering counsel nor by having Petitioner wave this Constitutionally protected right. The District Court also violated Petitioner's guaranteed right to counsel by not fulfilling it's obligation to ensure Petitioner not only waives his right to counsel, but that such a waiver is knowingly and intelligently made through a proper Faretta colloquy, or hearing. See Faretta v. California, 422 U.S. 806 (1975) and United States v. Peppers, 302 F.3d 120 (3rd Cir. 2002).

The entire proceeding in the case at bar was illegal in that it was done in violation of Petitioner's Sixth Amendment Right To Counsel.  Therefor, Petitioner's conviction should be vacated to correct the manifest injustice of being tried without the benefit of counsel as is defined by Supreme Court holdings in Gideon v. Wainwright, 372 U.S. 335 (1963) and Faretta v. California, 422 U.S. 806 (2002).

Also for the reasons stated above, Petitioner ask that counsel be
appointed for the issue before the District Court.


**GROUND #2** GENERAL SENTENCE/EXCEEDING MAXIMUM SENTENCE PER COUNT


The District Court imposed an illegal General Sentence of 228
months where no single count Petitioner was sentence under could
have exceeded a U.S.S.G. Level 28 Sentence.  Even allowing for Maximum
Criminal History Category VI, the maximum Guideline range is 140
to 175 Months.  Thus Petitioner's sentence is a miscarriage of justice
that is a plain error that affects Petitioner's substantial rights,
resulting in manifest injustice.  Further, as a result of the general
nature of the sentence, neither the Petitioner nor a reviewing court
can determine whether the sentence was legal on particular counts.
SEE United States v. Ward, 626 F.3d 179 (3rd 2010)


FACTUAL ASSERTION
Petitioner's Judgement paper imposes the sentence as follows:
'The defendant is hereby committed to the custody of the United States
Bureau of Prisons to be imprisoned for a total term of:' "228 months
on counts 2, 5-22, 25-41, 62,65-71 and 73-79 of the indictment concurrently.
This sentence is to run CONSECUTIVELY with the sentence imposed in
the Central District of Illinois CR 99-200042-1.  The CR2002-582-
1 sentence is to run CONCURRENTLY with the sentence imposed in the
Southern District of Ohio CR 1-02-007."  And Supervised Release of:
"3 years on counts 2,5-22,25-41,62,65-71 and 73-79".  The sentence
also imposes an Assessment for of $2,725.00.

- 10 -

The sentence breaks down as follows:

|  | COUNTS |
|---|---|
| 18:248(a)(1) Freedom of Access to Clinic Entrances Act | (2,5-21) |
| 18:2332a(a)(1) Threaten use weapon of mass destruction | (22,25-41) |
| 18:876 Mailing threatening communications | (62,65-71) |
| 18:875(c) Threatening interstate communications | (73-79) |

18:2332a(a)(2) carries the highest possible sentence with a maximum guideline penalty for the offenses Petitioner was sentenced under of Level 28.  Calculated at maximum Criminal History Category VI, a level 28 sentence range would be 140-175 months.
18:876 carries a maximum sentence of five years under the circumstances Petitioner was convicted.
18:875(c) carries a maximum penalty of not more than five years.
18:248(a)(1) carries a maximum sentence of one year.

CONCLUSION:

    Petitioner was sentenced to a General Sentence of 228 months, a sentence of which no single count could equal.  Thus this sentence is illegal, a plain error that adversely affects Petitioner's substantial rights, a manifest injustice that has resulted in a miscarriage of justice.  Therefor Petitioner ask that his entire sentence be vacated and set aside.

**GROUND #3** MULTIPLICITY/DOUBLE JEOPARDY

Seven (7) of the fifty (51) counts Petitioner was convicted under are duplicate charges for the same offense, violating Petitioner's Constitutional protection against double jeopardy.  These counts were charged in the indictment, given a guilty verdict by the jury, and sentenced by the Court.  They represent a miscarriage of justice.

1st Set of Double Jeopardy Counts:
Victim: Planned Parenthood, Birmingham, AL, Victim listed as "L.R.".
- Counts 18 & 19 for violation of 18:248(a)(1) on November 8, 2001.
- Counts 37 & 38 for violation of 18:2332(a)(2) on November 8, 2001
- Counts 55 & 56 for violation of 18:875(c) on Nov 7, 2001

2nd Set of Double Jeopardy Counts:
Victim: Planned Parenthood, Yeadon, PA, Victim listed as "L.P."
Counts 8 & 9 for violation of 18:248(a)(1) on October 12, 2001
Counts 28 & 29 for violation of 18:2332a(a)(2) on October 12, 2001

3rd Set of Double Jeopardy Counts:
Victim: Planned Parenthood, Yeadon, PA, Victim listed as "M.C."
Counts 16 & 17 in violation of 18:248(a)(1) on November 7, 2001
Counts 33 & 34 in violation of 18:2332a(a)(2) on November 8, 2001

CONCLUSION:
The United Supreme Court has held that where a defendant received two convictions for the same conduct, the error must be remedied

by vacating on of the convictions (in the case at bar, seven convictions).
Even where the District Court imposed concurrent sentences for the
multiplicitous convictions. SEE Ball v. United States, 470 U.S. 856,
(1985)  Therefor, Petitioner ask that the Court vacate the sentence
and conviction for the seven enumerated multiplicitous counts.


**GROUND #4** ILLEGAL SENTENCING ENHANCEMENTS IN LIGHT OF ALLEYNE

    Claim is brought under the authority of 28 U.S.C. 2255(f)(3),
triggered by Alleyne (June 17, 2013), which Petitioner claims is
retroactive with a first §2255 filing, and is filed within one year
of the U.S. Supreme Court decision.  This motion represents Petitioner's
first and only §2255 motion in this case.

    Petitioner was exposed to a sentence well above the statutory
minimum and was sentenced well above the statutory maximum on facts
that were uncharged in the indictment and were not heard by nor decided
by the jury.  All of the facts related to Petitioner's sentencing
enhancements were decided by the District Judge, who erroneously
acted as fact-finder in this case.

    Petitioner does not possess the PSI from the case at bar, nor
is the PSI in his Bureau of Prisons central file (as it is supposed
to be), so Petitioner is unable to enumerate the specifics of this
ground.  However, as 18 U.S.C. §2332a(a)(2) Threatening to use a
Weapon of Mass Destruction is the only charge against Petitioner

- 13 -

that could possibly be enhanced to 228 months, and this charge should carry a maximum Guideline range of 140-175 months, Petitioner contends that this charge was enhanced beyond the facts decided by the jury. This issue is further complicated by the fact that a General Sentence of 228 months was given (as is explained in detail under GROUND #2) making it impossible for Petitioner or a reviewing Court to determine the length of sentence on a given count.

Therefor the sentence in this case should be vacated to to protect Petitioner from the manifest injustice of being sentenced with illegal enhancements, that is enhancements not decided by the jury, in violation of Petitioner's due process rights and counter to the U.S. Supreme Court's holding in ALLEYNE.

**GROUND #5** -  ACTUAL INNOCENCE

One additional exception that may apply to extend the statute of limitation period of §2255 is activated when the petitioner is "actually innocent", or "factually innocent".  Petitioner contends this instant motion should be deemed timely because he is "actually innocent" of the eighteen (18) counts of 18 U.S.C. §2332a(a)(2) "Use of a Weapon of Mass Destruction".

18 U.S.C. §2332(a)(2) states:

§2332a

(a) Offense against a national of the United States or within the

United States.  A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction-

(1) against a national of the United States while such is outside of the United States;

(2) against any person or property within the United States, and

(A) the mail or any facility of interstate or foreign commerce is used in furtherance of the offense;

(B) such property is used in interstate or foreign commerce or in an activity that affects interstate or foreign commerce;

(C) any perpetrator travels in or causes another to travel in interstate or foreign commerce in furtherance of the offense; or

(D) the offense, or the results of the offense, affect interstate or foreign commerce, or in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce;

(3) against any property that is owned, leased or used by the United States or by any department or agency of the United States, whether the property is within or outside of the United States; or

(4) against any property within the United States that is owned, leased, or used by foreign government,

...shall be imprisoned for any term of years or for life, and if death results, shall be punished by death or imprisoned for any term of years, or for life.

Petitioner contends that he is actually innocent of these eighteen (18) counts on two grounds:

- 15 -

1.) That §2332a(a)(2) (as Petitioner is convicted under) is not a valid charge under the statute, as §2332a(a)(2) requires the subsection of either (A), (B), (C), or (D) to complete the charge.  This is evident in the statute as subsection (2) states "against any person or property within the United States, **and**"  The "and" followed by definitions of A, B ,C, & D is a necessary part of the charging statute. Without charging either A, B, C, or D, in the indictment, Petitioner's indictment represents an flawed charge and everything that follows was in error as well.

2.) That §2332a addresses serious threats against the United States made with serious weapons, that is, a weapon classified as a weapon of mass destruction.  Throughout the statute's language it makes use of dangerous weapons a crime, but no where does it make reference or allusion to a harmless device, such as white flower.  No matter how you cook it, white flower is not a "Weapon of Mass Destruction". Petitioner contends that §2332a does not include the threatened use of a harmless white powder, regardless of what the person making the threat calls the harmless white powder.  If congress intend for harmless threats to be included in §2332a then they were far to ambiguous in the wording for it to be used.  Other statutes cover threats of fake anthrax, such as 18 U.S.C. §876 "Mailing Threatening Communications", and 18 U.S.C. §875(c) "Threatening Interstate Communications".  In fact, in the case at bar Petitioner was convicted of eight (8) counts of §876 and seven (7) counts of §875(c) for the same acts that §2332a was charged.

- 16 -

Therefor, whether the Court considers that §2332a(a)(2) was an incomplete statute to charge on, or that the wording of §2332a does not include threats of harmless white powder, Petitioner is actually innocent of these eighteen (18) counts of "Threatened use of a Weapon of Mass Destruction", so the conviction of said counts should be vacated to correct a manifest injustice.

CONCLUSION:

18 U.S.C. §2332a is a statute against threatening to use a weapon of mass destruction that the defendant actually has access to, or at least believes he has access to.  In the case at bar Petitioner used white flower in the first wave on "fake anthrax" mailings and a harmless white powder used to kill bole worms in cotton in the second.  At Petitioner's trial, one of the world's leading experts on biological weapons from the CDC in Atlanta, Georgia, testified that the white powder used in both waves of mailings were completely harmless.  Petitioner was well aware of the powder's benign nature as he purchased the flower from a grocery store and the bole worm powder from a feed store.  There was never any allegations that Petitioner held any belief other than that both sets of white powder were harmless.

In addition to adding years to my sentence (we don't know how many years because of the General Sentence in this matter.  See GROUND #2) there can be little doubt that a conviction under §2332a, "Threatening Use of a Weapon of Mass Destruction", a terrorism statute, will have a life long adverse affect on Petitioner.

- 17 -

The Supreme Court recently held that a credible showing of actual innocence will allow a federal court to disregard the one-year limitation period found in the AEDPA, which includes 28 U.S.C. §2255.  See McQuiggin v. Perkins, 133 S.Ct 1924 (2013).  McQuiggin creates an actual/factual innocence "Gateway" through which an otherwise untimely §2255 claim may pass.  This instant motion includes facts and circumstances which support an actual/factual innocences gateway as provided by McQuiggin, thus granting this court jurisdiction to rule on the merits of the claim herein.  Petitioner further contends that this issue is greatly mitigated by the fact that Petitioner went to trial without the benefit of his Sixth Amendment Right to Counsel (See GROUND #1).  Which is why Petitioner never appealed nor filed a timely §2255 motion.


EQUITABLE TOLLING

Petitioner proposes a novel equitable tolling claim that relates to the Ground #1 claim of Violation of Sixth Amendment Right to Counsel. In any 28 U.S.C. 2255 motion filed more than a year after a case has become final, as this one more than has, the Government will object on the grounds that the District Court lacks jurisdiction. While this 2255 motion carries several exceptions to the one year rule, namely retroactivity exemption of 2255(f)(3) for ALLEYNE, the Actual Innocence gateway, and the guaranteed protection against a Constitutionally enumerated right, namely a right to counsel, Petitioner also makes a case for Equitable Tolling.

Petitioner asks the District Court to consider a liberal view
of the equitable tolling clause.  Namely that at the time a conventionally
tolled Section 2255 motion would have expired in this case, Petitioner
was still under the influence of the Axis I delusional disorder,
which was thoroughly covered in this document.  As was stated under
Ground #1 claim, Petitioner had been diagnosed with a double Axis
I mental disorder: "Adjustment Disorder with Disturbance of Emotions
and Conduct(Chronic)" and "Delusional Disorder (Grandiose Type)".
As has been medically diagnosed and well documented, this disorder
was brought on by a severe life stressor, namely the death of Petitioner's
granddaughter while still in the womb.  Well past the time when a
2255 motion's one year would have expired, Petitioner was still suffering
from this disorder.  In fact, during the time of Petitioner's trial
in in the case at bar, Petitioner filed a frivolous federal court
challenge to Roe v. Wade's Constitutional validity (3rd Cir).  This
would be no surprise to any one who knew anything about the Petitioner
at the time.

However, over time a change occurred in Petitioner and he began
to question his position and his acts.  In early 2011 Petitioner
was contacted by the Discovery Channel with an interview request
for a show about some of his exploits.  By this point Petitioner
had begun to experience a serious change of heart, and saw the show
as a means to express remorse to those he had harmed.  Ultimately
the Bureau of Prisons did not allow the interview, but the Discovery
Channel producers agreed to read Petitioner's written statement as
part of the show.  Petitioner wrote the statement, but was not allowed

to mail it (by BOP).  A copy of this statement is provided here as
Exhibit A.  The statement shows not the defiantly anti-abortionist
this Court, and three other District Courts, saw, but rather a man
who had had the scales removed from his eyes.  Inspired by the Discovery
Channel Statement Petitioner had just written, he wrote an apology
letter to his primary victim, Planned Parenthood.  Attached as Exhibit
B.  Because of a BOP policy that prohibits inmates from contacting
their victims, Petitioner was not allowed to mail this letter either,
though he made every effort possible to get an exemption from this
rule.

Reading these two enclosed Exhibits provide insight into Petitioner's
changing world view.  A few years earlier Petitioner was still controlled
by the need to strike out at entire abortion industry, yet in 2011
Petitioner apologized with no hope of personal gain for showing remorse.

At the time Petitioner wrote the two referenced letters he had
active appeals, nor any known path for relief from his sentence in
any way.  Those letters represented a sincere change of heart, nothing
more.  Petitioner had never filed a Section 2255 motion, and at the
time of the letters had no thoughts of doing so.  It wasn't until
the rulings in Descamps and Alleyne that Petitioner began doing legal
research with thoughts of filing his first Section 2255 motion with
a Descamps challenge to the predicate offenses for his ACCA conviction
on another case.  It was during this, his first clear headed thoughts
of post-conviction legal filings that Petitioner began to see other
issues in his case that might grant him some relief.

- 20 -

This was the path to a long delayed Section 2255 filing.  What Petitioner ask here, is that the District Court allow for an extended equitable tolling by factoring that Petitioner was under the influence of a medically diagnosed mental illness that prevent him from looking at the legal process rationally.  And as Petitioner did not have a lawyer in this case, he lacked the benefit of legal counsel to advice him of his rights.

This was the same mental illness that caused Petitioner to "go to war against the abortion industry" (in Dr. Greenstein's opinion) and the same mental illness that drove Petitioner to go to federal trial in Illinois, Ohio, and Pennsylvania on cases that were impossible to win.

Given this unique history, it is not a great stretch to conclude that the reason Petitioner fought hard at multiple trials, but never filed a single post trial appeal or motion (Attorney's filed direct appeals in Illinois and Ohio, but Petitioner was not involved in those at all) was that Petitioner was fully under the control of a medically diagnosed delusion that he was "God's warrior".  So much so that Petitioner did not consider the aftermath of his actions past the fight itself.  It was only after Petitioner's mind had some time to heal that he could see the legal options open to him through post-conviction remedies.

In summary, Petitioner makes the novel approach of asking the District Court to consider the issues presented here as timely given the circumstances presented.

Date: 1-15-2014                    Respectfully Submitted,

Clayton L. Waagner, pro se
No. 17258-039
U.S.P. Lewisburg
P.O. Box 1000
Lewisburg, PA 17837

Discover Channel Statement                              April 27, 2011

    Between early 1999 and late 2001 I undertook a deliberate and calculated
attack against abortion clinics and affiliated organizations across the Eastern
and Central United States.  I did everything within my ability to disrupt their
operations and terrorize those who worked for the organizations.  During this
campaign of terror I posted a vicious Internet threat and sent more than half
a thousand threat letters laced with white powder purported to be anthrax.  These
fake anthrax letter were made both creditable and frightening as real anthrax
was then circulating through the mail exposing 30,000 people to lethal spores,
seriously sickening seventeen, and killing five people.

    While an FBI 10 Most Wanted fugitive I was described as the "abortion industry's
worst nightmare".  At the time those words made me proud and warmed my soul.  Today
when I consider that I deliberately caused real people to fear and experience
very real nightmares I can feel nothing but shame for my cruel and malicious acts.

    I first began to understand how cruel and wrong my actions were at my trial
for the anthrax mailings in Philadelphia.  There I heard often painful testimony
from some who were the focus of my terror.  Before this they were a faceless enemy
for which I held no empathy.  During the trial I saw decent people, individuals
who believed in their conviction as strongly as I believed them wrong.  I began
to see them as courageous individuals fighting for what they believed.  For several
years after the trial I repressed the shame I felt for my acts and had to fight
a growing conviction that what I had done was wrong.  I had committed to all out
war, invested my freedom and sacrificed my family, so no part of me wanted to
concede error.  Still my radical fire slowly .

    By the close of 2009 I was unable to suppress my feelings and began sharing
my shame with my wife and children.  Then in April of 2010 I wrote an article
for an extremist anti-abortion newsletter to share my new views.  I was inspired
by the ranting of another imprisoned extremist calling those who did not take
up arms to fight abortion cowards.  I had read his rants for years and could no
longer remain silent.  I countered his militant rant with my new views in a thoughtful
article encouraging nonviolence.  My article was never published.

    Over the course of 2010 I began sharing my new views with well known pro-
life extremist.  Surprisingly some agreed with me, but most put my new views off
as a temporary mood I was in.  Few seemed willing to accept that I could become
so moderate.  To them I was a hero who would never turn away from the true faith
of all out war.  But I have changed.  I have not changed my views for self serving
reasons.  I have a fifty year federal prison sentence and will never be eligible
for parole.  I have exhausted all of my appeals and have no chance of ever being
re-sentenced.  Taking this stand will only hurt me in that I am very likely to
lose all the support I receive from those in the radical anti-abortion movement
at a time when such support is important to me.  The only reason I could possibly
have to offer this apology is a genuine change of heart.

    Though abortion rights advocates and I will always disagree on the underlying
issue, I have come to respect those who work to protect a woman's legal right
to chose.  I understand now that they work at the clinics out of a genuine conviction
of belief.  I respect their stand on principle and admire their courage and tenacity.
They did not deserve the terror I inflicted on them and I am truly sorry for my

crimes against them.   I have already sent an open letter of apology to Planned Parenthood Federation of America and to the National Abortion Federation.   I have also offered to write an individual letter of apology to all of the thousands who were harmed by my hand.   Out of concern that an unsolicited letter from me could be unsettling I am only writing a personal apology letter on request.

Saying 'I'm sorry' does little to compensate the harm I have caused so I am backing my apology with action.   I am giving my name and my energy towards preventing future violence against those who work in the abortion industry in an effort to create an atmosphere of rational and peaceful debate.   An atmosphere that has no room for violence.   My pledge to those I have harmed is to do all that I can to prevent the next pro-life activist from becoming a terrorist.   My promise to my victims is to work as hard towards preventing violence against them as I had once worked to bring violence to them.

For those who believe as I, that pre-born life is scared, I encourage you to become involved in the debate in a strictly legal manner.   To back principled pro-life candidates in local and national elections.   To volunteer your time and give your money in support of crisis pregnancy centers.   And to participate in peaceful, legal protest.   When you protest a clinic I implore you to treat the facility staff with respect and dignity.   Those who work at the clinics are not evil, but people who honestly disagree with you.   As strongly as you believe them wrong, they believe they are providing a necessary, legal, humanitarian service.   It is critical that you respect their conviction if you ever expect others to respect yours.   And above all learn from my mistakes.   Abortion is legal in America, so any efforts to prevent the act is in violation of our laws.   And those laws have severe penalties.   In breaking the law to prevent abortions I have not only destroyed my personal life, but I have lost the ability to affect lasting and permeant change over the issue for which I feel so passionately.   You are far more valuable to this cause when you use our system of laws to work for lasting change.   The abortion debate can be won through legal means.   It will not be easy nor it will not be quick, but when won it will be just and it will be permeant. I will never be able to redeem the damage I have caused.   Nor will you be able to redeem yourself if you allow your passion and frustration to drive you to commit an illegal act.   It is admirable to fight for your conviction, but always do so with dignity and honor, and always within the boundaries of the law.

Sincerely,

Clayton Waagner #17258-039
USP Lewisburg
P.O. Box 1000
Lewisburg, PA 17837

Open Apology Letter to Planned Parenthood                          May 2, 2011

Between early 1999 and late 2001 I worked purposefully to undermine the daily operations of Planned Parenthood and its affiliates. I posted Internet threats and sent more than half a thousand threat letters laced with white powder I purported to be anthrax. Though harmless, this threat was made creditable and frightening as it coincided with real anthrax in the mail which exposed 30,000 people to lethal spores, seriously sickened seventeen, and killed five.

I first began to understand how cruel my actions were at my trial where I heard painful testimony from some exposed to my letters. No longer a faceless enemy, I encountered real people who believed in what they did as strongly as I believed them wrong. At that point I began to see you as courageous individuals with strong convictions. Still, I repressed a growing sense of shame for what I had done to you. For several years I fought against allowing this growing conviction to assuage my fervor. I had committed to a course, lost my freedom and sacrificed my family, so no part of me was willing to concede error. Still the radical fire slowly tempered against a reality I could no longer ignore.

In late 2009 I admitted to my wife and children that I had been wrong in all that I had done. Inspired by the rants of one of my peers, in April of 2010 I sent a letter to an extremist newsletter sharing my new conviction and encouraged nonviolences. My article was never published.

Over the course of 2010 I shared my conviction of nonviolence with a few well known pro-life extremist. Some saw my point, but most ignored the letter, unwilling to accept I could become a moderate. But my once passionate belief has changed. There are no self-serving reasons for this change of heart and apology. I have a fifty year federal prison sentence with no eligibility for parole. All appeals are exhausted with no chance of re-sentencing. The only reason to offer this apology is a genuine change of heart.

Though we will always disagree on the underlying issue, I now understand that you work to protect a woman's right to choose out of genuine and principled conviction. I have come to respect your stand on principle and admire your courage and tenacity. You did not deserve the terror I inflicted on you. I am truly sorry for my crimes against you, and for my deliberate and malicious acts I feel only shame. I have written an open apology letter out of necessity, however, I have a burning need to write a personal apology letter to any who would accept one from me.

When my first child was very young I closed a car door on her hand. I repeatedly told her how sorry I was, but in tears she said, "Daddy, sorry's not good enough". Her innocent wisdom holds true here as well. Saying "I'm sorry" does not correct the harm I have caused. I can never undue what I have done to you. If there were something I could do, I would do it energetically. I hope you find some peace in my change of heart. If I can change, others can as well. Again, I am very sorry for the pain I caused you.

Sincerely,

Clay Waagne

Clay Waagner

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CLAYTON LEE WAAGNER,
     Petitioner/Defendant

                               Case No. 2:02-cr-00582-AB-1

                               Civil No._____

v.                              Hon. Anita B. Brody

UNITED STATES OF AMERICA,
     Respondent
_____/

## AFFIDAVIT IN SUPPORT OF MOTION UNDER 28 U.S.C. §2255

    I, Clayton Lee Waagner do hereby deposes and say:

1) I am the Petitioner/Defendant in the above stated matter, and affirm that I am familiar with the history and background of this case.

2) I have prepared the instant motion from the best available means, including personal recollection.

3) That I am actually/factually innocent of 18 U.S.C. §2332a, "Use of a Weapon of Mass Destruction", under the statutory definition of that offense.

4) That at my Arraignment the AUSA asked the Magistrate something about appointing counsel for me, and the Magistrate responded by saying something to the effect of, "It was my understanding that he was going to represent himself." Then the Magistrate asked me something like: "Are you going to represent yourself?", to which I responded with an affirmative, something like "yeap", or "Yea", or "Yes". My memory is not clear on the exact words used in this exchange more than ten years ago, but I am confident that I have the sentiment correctly stated.

5) That I did in fact act as my own counsel throughout the entire pre-trial, trial, and sentencing process, with Luis Ortiz acting as my stand-by counsel.

6) That at no point did the District Judge offer to provide me with counsel.

7) That at no point did the District Judge discuss with me my right to counsel, nor inquire as to whether such a waiver was knowingly and intelligently made.

8) At no point did the Magistrate or the District Judge hold a Faretta type hearing.

9) That I now believe that through this entire legal process, and years beyond it, I was under a misguided and delusional belief that God had called me to fight legal abortoins.

10) That I attempted to use the trial in this case (and all the others as well) as a platform to promote the anti-abortion platform I believed so much in at the time.

11) That I can now see how foolish it was to represent myself, and go to trial on an issue that could not have possible been won.  That had I been thinking rationally I would have plead guilty and sought mercy from the Court based on my mental disorder.

12) That I always knew that the white powder I sent to abortion clinics was harmless. And that I was under no delusion that it was actually anthrax or any other weapon of mass destruction.

13) That I attempted (through my family and BOP Officials) to acquire a copies of my PSI in this matter, but was unsuccessful.

14) That after the Supreme Court's ALLEYNE and DESCAMPS rulings I began to see for the first time that I had appealable grounds in this matter.

15) That without the Axis I disorder that I suffered from I would not have went to trial in this matter as I now see that I could not have possibly won.

16) That, because of my delusional belief that my sole purpose in life was to combat abortion, I never filed an appeal or post-conviction relief motion because until very recently I had no thoughts of my own legal needs and was only interested in legal acts that could bring attention to the abortion issue.

17) That I no longer believe I was called by God or anyone else to combat abortion. That my actions were brought on by the pain I suffered after the loss of my granddaughter's premature birth and death.  And that all that I did from 1999 until very recently was completely unjustifiable, and not only illegal, but morally wrong.

18) That I wrote the Exhibit A statement to Discover Channel producers on April 27, 2011 for the dual purpose of discouraging others from following my path and offering apology to my victims.  That I did not  write the letter with intentions of presenting it to the court years later, as I am doing now.

19) That I was prohibited by BOP officials from mailing the Discovery Channel Statement.

20) That I wrote the exhibit B "Open Apology Letter to Planned Parenthood" on May 2, 2011 for the sole purpose of offering apology to my victims.  And that I had no intentions of ever presenting it to the Court, as I am now doing two years later.

21) That I was prohibited by BOP officials from mailing the apology letter to Planned Parenthood due to a BOP policy that prohibits inmates from writing to their victims.

22) That if this Court gives an evidentiary hearing on this matter, I will testify as to the above stated allegations (and those set forth in section 2255 motion).

    I declare under penalty of perjury that the foregoing is true and correct to the best of my recollection. See, 28 U.S.C. §1746.

Dated: 1-15-2014

Clayton Waagner #17258-039
USP Lewisburg
P.O. Box 1000
Lewisburg, PA 17837